IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
(*Danville Division*)

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| | ) | |
| v. | ) | **Case Number: 4:18CR00011-04** |
| | ) | |
| | ) | |
| **DASHAUN LAMAR TRENT** | ) | |

**DEFENDANT'S OPPOSITION TO UNITED STATES'**
**MOTION REGARDING JURY COMPOSITION**

COMES NOW your defendant, Dashaun Lamar Trent (hereinafter "Trent"), and respectfully moves this Court for entry of an order denying the *United States' Motion Regarding Jury Composition* and states the following in support thereof:

The United States seeks to try Trent before a jury pulled from the Roanoke Division of this Court instead of the community in which the alleged crimes occurred - the Danville Division. At the outset, there is no question that this Court has the discretion to pull a panel from either the Danville Division or the Roanoke Division. The only question is whether the Court ought to allow Trent to be tried by a jury of his peers as opposed to a jury of his nearby peers. Another consideration, not addressed by the United States in her brief, is the question of race. All of the defendants are African-American. As show by statistics derived from the U.S. Census Bureau,[1] the population of the cities and counties which comprise the Roanoke Division[2] of this Court equals 605,004. According to the same statistics, of that 605,004 people, 53,902 or 8.9% are African-

---

[1] *See* www.census.gov/quickfacts.

[2] Roanoke County, City of Salem, City of Roanoke, Botetourt County, City of Covington, Alleghany County, Craig County, Bland County, Carrol County, Grayson County, City of Galax, Wythe County, Floyd County, Giles County, Montgomery County, Pulaski County, City of Radford, and Franklin County.

American. Reviewing the population statistics of the Danville Division[3] reveals that the total populous is 231,104 of which 68,071 are African-American - 29.4%.

Trent does not argue, or even suggest, that the United States is purposely attempting to use the demographic differences in race between the Danville and Roanoke divisions in support of her motion for a Roanoke Division jury panel. Trent's only point on race is that a Danville Division will be much more likely to produce a jury of his peers than would a panel from the Roanoke Division. Reasonable people can disagree as to the "complications a Danville Division-based jury presents in light of the Court's ruling that the trial will be held in Roanoke."[4] Trent suggests that the "complications" are minimal.

The United States, expresses concern over the fact that "many jurors would need to travel upwards of two hours *one way*, each day, for seven weeks . . . ."[5] It is then suggested that such travel could result in jurors being ""burned out" by the commute and may become less attentive during the trial or may push to reach a verdict quickly instead of thoroughly deliberating on the evidence."[6] Fortunately, these concerns are easily allayed by drawing a panel from the Danville Division and putting the trial jurors and alternates in the Hotel Roanoke for the duration of the trial. They need not be sequestered, but allowing them to stay in a hotel is a way to keep them from having to travel such long distances each day. The Court should disregard any counter argument which focuses on the expense of such a ruling. This Court is not the keeper of the public fisc and the due process rights of the defendants should not be subject to such thinking. The United States chose to prosecute Trent and the United States Treasury will not be depleted by ensuring that those rights are protected.

The government notes that "[s]equestration can also give rise to a host of other issues during trial in the event jurors and others do not follow the Court's sequestration instructions."[7] Jurors, are,

---

[3] City of Danville, Pittsylvania County, City of Martinsville, Henry County, Patrick County, Halifax County, and Charlotte County.

[4] Motion of the United States at page 3.

[5] *Id.*

[6] *Id.*

[7] Motion of the United States at page 5.

of course, ordinarily presumed to follow their instructions.[8] The Court can, and should, instruct the jurors that they cannot deliberate or discuss the case while staying at the hotel but that they may visit with family members and loved ones. The United States doesn't even mention what instructions the jurors might not follow. Further, the United States does not recognize the possibility of putting juros in a hotel without sequestration.

The United States urges the Court to consider that the impact of extensive publicity (which in actuality is not really extensive) will result in "members of a Danville Division *venire* [of having] a higher chance of having preconceived judgments regarding the defendants and their conduct."[9] This argument is not supported by any facts in the government's motion. It is posited in the form of: "to the extent the Court and counsel have expressed concern regarding the extensive publicity of the case in the Danville-area. . . ."[10] In other words, this concern arises from little more than some unarticulated concern about media. Of course, the obvious answer to jurors who have been exposed to any media regarding this case is effective *voir dire* and a thorough juror questionnaire.

Finally, the government claims that a "Roanoke Division *venire* would also ameliorate safety concerns and concerns that jurors know or are related to the numerous defendants and witnesses."[11] Again, the obvious answer to this concern for safety [largely imagined by the United States] and juror knowledge is the use of strikes for cause by the Court.

As to this Court's actual decision regarding which panel from which to pull the *venire*, there are two issues about which this Court should consider. The first is the impact of drawing the *venire* from a division comprised of 8.9% African Americans (Roanoke Division) compared to the Danville Division comprised of 29.4% of African Americans. The second is the historical origins and importance of the concept of trial by a jury of one's peers.

In *Swain v. Alabama*, the United States Supreme Court recognized that a "State's purposeful or deliberate denial to Negroes on account of race of participation as jurors in the administration of

---

[8] *Richardson v. Marsh*, 481 U.S. 200, 206 (1987) *accord Hill v. O'Brien*, Case No. 7:08-cv-00283 (J. Turk, W.D. Va., 2012).

[9] Motion of the United States at page 5.

[10] *Id.*

[11] *Id.*

justice violates the Equal Protection Clause."[12] In *Batson v. Kentucky* the U.S. Supreme Court reaffirmed that portion of *Swain* recognizing that racially based juror strikes violated the Equal Protection Clause by stating that "[t]his principle has been 'consistently and repeatedly' reaffirmed, in numerous decisions of this Court both preceding and following Swain. We reaffirm the principle today."[13] As mentioned *infra*, Trent does not suggest or argue in any way that the United States' motion is base on purposeful racial discrimination. The point being emphasized is that the federal courts have been a powerful weapon in the struggle to ensure that African-Americans defendants need not fear having members of their own race be struck from juries merely because of race. In other words, if the United States' motion is granted - the effect of that decision may very well deprive defendant's of a jury of their peers. It is not purposeful - yet it may be a collateral and undesired effect of pulling a *venire* from the Roanoke Division. The due process rights of Trent would be better protected if the jury he faces is drawn, not only from his community and where the alleged criminal conduct transpired, but from a pool of jurors that reflects the racial demography of that community. The citizens of Danville have an important public interest in being able to serve on this jury since all of the crimes alleged in the indictment occurred in Danville.

There are also historical reasons to consider in rejecting the United States' motion. The Constitution of the United States mandates in Article III, Section 2, that:

> The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury; and such Trial shall be held **in the State** where the said Crimes shall have been committed.

The Sixth Amendment to the Constitution of the United States mandates that:

> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, **by an impartial jury of the state and district wherein the crime shall have been committed**, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defense.

---

[12] 380 U.S. 202, 203-04 (1965). *Batson v. Kentucky* 476 U.S. 79, 82 (1986) overturned the portion of *Swain* which put an evidentiary burden on defendants who claimed a denial of their equal protections rights when a prosecutor excluded members of the defendant's race using a peremptory challenge.

[13] *Batson v. Kentucky* 479 U.S. 79, 84 (1986).

Clearly, the Founding Fathers placed great emphasis on the importance of the relationship between the situs of the crime and the vicinage of the jurors in whom the responsibility of the verdict would be placed. That being said, the decisional caselaw manifestly makes clear that "there is no statutory or constitutional right to a jury drawn either from the entire judicial district or from the division in which the offense occurred."[14] Thus, this Court retains the authority and flexibility to draw jurors from different divisions within the greater district. What to do?

The question presented to this Court falls squarely in the category of the Court's own sense of justice and fair play. It is pure discretion. As mentioned herein before, the Founding Fathers were keen on the idea of the relationship between the situs of the alleged crime and venue for any jury trial and, as such, enshrined the concept of vicinage in the Constitution and the Bill of Rights. The phrase, "jury of one's peers" does not appear in either document. The idea of being tried by one's peers dates back as far as 1215 A.D. As Justice John Marshall Harlan noted in *Spark v. United States*[15] - "[b]y Magna Charta, no person could be taken or imprisoned or deprived of his freehold or of his liberties or free customs, unless by the lawful **judgment of his peers**, or the law of the land."

In the declaration of rights unanimously adopted October 14, 1774, by the Continental Congress, of which John Adams, Samuel Adams, Roger Sherman, John Jay, Samuel Chase, George Washington, and Patrick Henry were members, it was resolved "that the respective colonies are entitled to the common law of England, and more especially to the great and inestimable privilege of being **tried by their peers of the vicinage**, according to the course of that law."[16]

It is respectfully submitted that the right thing to do in this instance is what our vast and powerful Anglo-American history dictates: try Trent before a jury of his peers. Trent is from Danville and his peers should decide his fate. The fact that this Court is permitted to draw a panel from Roanoke doesn't mean it's the right choice. I suggest that this Court follow King Edward VII's action when he received the Petition of Right regarding a 13 year old naval cadet accused of stealing

---

[14] *United States v. Grisham*, 63 F.3d 1074, 1080 (11th Cir. 1995).

[15] 156 U.S. 51, 114-15 (1895). [emphasis added]

[16] 1 Jour. Cong. 28. [emphasis added]

a five pound note and signed it "Let Right be Done."[17] Let right be done in this case and draw the *venire* from the Danville Division.

WHEREFORE, your defendant, by counsel, respectfully moves this Court for entry of an order denying the United States' Motion Regarding Jury Composition and, instead, draw the *venire* in this case from the Danville Division.

Respectfully submitted,

DASHUAN LAMAR TRENT

/s/Chris K. Kowalczuk

Chris K. Kowalczuk, Esq.
P.O. Box 11971
Roanoke, VA 24022
(540) 345-0101
    Counsel for Defendant

Patrick J. Kenney, Esq.
P.O. Box 599
Roanoke, VA 24004
(540) 491-0423
    Counsel for Defendant

CERTIFICATE OF SERVICE

I, Chris K. Kowalczuk, Esq., counsel for Dashaun Lamar Trent, hereby certify that on this 16th day of April, 2019, the foregoing was forwarded to counsel for the United States and all counsel of record in this case via the Court's electronic case filing system.

/s/Chris K. Kowalczuk

---

[17] George Archer-Shee, a 13-year-old cadet at the Isle of Wight's Osbourne Naval College, was accused of stealing a five shilling postal note from the locker of a fellow cadet in 1908. The case was appealed to the House of Lords where justice prevailed and Archer-See was acquitted.