CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

NOV 0 8 2019

JULIA C. DUDLEY, CLERK
BY: _____
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### DANVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | Case No.: 4:18-cr-00011 |
| v. | ) | |
| | ) | |
| | ) | |
| MARCUS JAY DAVIS, | ) | |
| | ) | By:   Michael F. Urbanski |
| Defendant. | ) | Chief United States District Judge |

## MEMORANDUM OPINION

This matter comes before the court on the motion of defendant Marcus Jay Davis to dismiss all or some counts of the First Superseding Indictment based on prosecutorial misconduct related to certain discovery violations. ECF No. 1064. The government has responded. ECF No. 1070. The court has reviewed the parties' pleadings and the newly disclosed state grand jury transcripts and concludes that Davis has suffered some prejudice because of the late evidentiary disclosure. As a result, the court will dismiss Count Ten of the First Superseding Indictment. Accordingly, Davis's motion to dismiss is **GRANTED** in part as it relates to dismissing Count Ten of the First Superseding Indictment and **DENIED** in part as it relates to dismissing Counts One, Eleven, Twelve, and Thirteen of the First Superseding Indictment. The court is compelled to issue this intermediate sanction for the repeated failings by the prosecution team, and particularly the Commonwealth's Attorney for the City of Danville and Special United States Attorney, Michael Newman, to comply with the court's discovery orders and to timely provide discovery bearing on gang violence in Danville to the defense. Because of the continued nature of the government's actions, the court is

convinced that to allow the repeated discovery violations to go undeterred would send a message that discovery orders in complex criminal cases may be trifled with at severe costs to the rule of law and the fairness of our criminal justice system. To deter future violations of the court's discovery orders, and to remedy the prejudice sustained by the defense in this case by repeatedly having to divert their attention from the ongoing trial to review, evaluate, and address newly disclosed state grand jury transcripts concerning gang activity in the Danville area, the court will impose a Federal Rule of Criminal Procedure Rule 16(d) sanction. For these reasons and those that follow, the court dismisses Count Ten of the First Superseding Indictment against Marcus Davis. Davis will face the jury next week on Count One, Eleven, Twelve, and Thirteen, for which he continues to face a maximum penalty of life imprisonment.

## I.

This is not the first time the court has had to address claims of prosecutorial misconduct in this case. First, two days before jury selection was scheduled to begin, the government notified defendants that it had discovered a working copy of the DaShawn Anthony interview tape that it had originally claimed to be lost or corrupted. The court addressed this late disclosure in its Memorandum Opinion, dated October 11, 2019. ECF No. 905. At the time, the trial was yet to begin, and so the court determined that the newly disclosed video was not prejudicial to the defendants because the defendants had sufficient time to review the interview and accommodate any new information in their defense. The court also determined that the late disclosure was not prejudicial because the government did not intend to call Anthony as a witness.

2

Then, on October 15, 2019, immediately following the swearing in of the jury in this trial, the court was presented with the government's second discovery violation. Defense counsel alerted the court and the government that it had become aware of a multijurisdictional grand jury ("MJGJ") that had been impaneled by the City of Danville and Pittsylvania County to investigate violent crimes in the Danville, Virginia area. The government then disclosed transcripts of Ontwoinette Epperson and Lashanda Washington, two individuals who testified before the MJGJ on November 7, 2017. Both Epperson and Washington appeared on the government's witness list. The next day, on October 16, 2019, after opening statements were made by the government and defense counsel, the court addressed the question of additional MJGJ testimony. At first, the government, upon information provided by Mr. Newman, informed the court that there were no additional transcripts.[1] However, after further caucus, the government informed the court that more witnesses testified before the MJGJ. As was later revealed, those witnesses included Tanikqua Fuller and Laquante Adams, both named defendants in the First Superseding Indictment, and Tyson Bowens, a government witness.[2] The government eventually uncovered other Special Grand Juries also related to violent crime in the Danville, Virginia area. The court granted a continuance in the case to allow the government time to produce the transcripts to the defendants and to give the defendants time to incorporate the new evidence into their defense.

---

[1] In the government's response in opposition to Davis' motion to dismiss, the government attempts to distance the United States from Mr. Newman. Mr. Newman is a Special United States Attorney in this case and, until now, has remained counsel of record in this case.

[2] Other persons testifying before the MJGJ appeared on the government's witness list in this case, but ultimately were not called to testify at trial.

3

Based on the late disclosure of this state grand jury information, counsel for the defendants filed a motion to dismiss the First Superseding Indictment, claiming prosecutorial misconduct, a violation of Brady v. Maryland, 373 U.S. 83 (1963), and a violation of the court's Third Amended Scheduling Order. The government responded, arguing that the late disclosure was unintentional, did not prejudice the defendants, and any evidence was cumulative or speculative.

The court undertook a painstakingly thorough investigation of the transcripts provided by the government and determined that there was not a Brady violation and that the defendants did not suffer prejudice as a result of the late-disclosed testimony. The court entered a Memorandum Opinion denying the motions to dismiss on October 11, 2019. ECF No. 1031. The court relied on a number of factors. First, the court found that the introduction of the new evidence was not prejudicial because the evidence came to light before the first witness testified. Second, the trial was delayed for more than ten days, which allowed defendants sufficient time to incorporate any new evidence into their defense. Third, the court determined that any evidence provided in the new transcripts was cumulative, speculative, or irrelevant. Although the court determined there was no prejudice to the defendants, in order to mitigate any potential prejudice and to deter future misconduct, the court imposed certain sanctions on the government. The court limited the government's ability to use any new evidence provided in the grand jury transcripts or to question any of the witnesses about such testimony. The court also took the unusual steps of allowing defendants to conduct a second opening statement and instructing the jury as to the cause of the delay. The court intended

4

this ruling to conclude the discovery debacle and ruled that the trial would begin on Monday, October 28, 2019, in Danville, Virginia.[3]

Meanwhile, on October 18, 2019, Davis filed a motion to permit inspection of MJGJ documents from the Danville Circuit Court, ECF No. 945. On October 25, 2019, the court ordered the government to produce all state special and MJGJ notes, transcripts, and other evidence relating to or pertaining in any way to the allegations brought in the First Superseding Indictment, to the extent the materials had not already been produced. ECF No. 1036.

On October 28, 2019, the trial resumed, and the government presented its first witness. At 9:33 p.m. that evening, the government alerted Davis and the court by email that it had identified additional state grand jury testimony of Detective Jerry Pace that had not yet been disclosed.[4] At a hearing the next morning on October 29, 2019, the court heard argument from the government and Davis as to how to remedy this new discovery violation. During that hearing, Mr. Newman appeared in court with two bankers' boxes filled with manila folders containing tapes and notes relating to the Danville MJGJ and Special Grand Juries called between 2015 and 2018 and various other loose papers consisting of correspondence with the state court, copies of subpoenas, and other miscellaneous papers.

During the October 29, 2019 hearing, Mr. Newman outlined the steps he took to produce all remaining evidence relating to the grand juries, including personally going to the

---

[3] Perhaps reflecting the magnitude of the discovery problem, seven of the eight defendants facing trial entered guilty pleas in the days immediately following the late discovery disclosure. ECF Nos. 974, 978, 982, 992, 1005, 1017, and 1029. Five of these defendants, facing a mandatory life sentence if convicted of Count Ten, entered Rule 11(c)(1)(C) guilty plea agreements providing for 13 to 15 year sentences. Two other minor actors, defendants Ashley Ross and Tanikqua Fuller, pled guilty and received sentences of probation. Davis is the sole remaining defendant.

[4] It is evident that the United States Attorneys were as blindsided as the court and defense by the Commonwealth's Attorney's continued revelations of unreviewed state grand jury testimony.

circuit court to obtain the files. The court and Davis conducted extensive questioning of Mr. Newman regarding the grand juries and Mr. Newman's record keeping process. Upon recommendation by the government, a member of both the government and Davis' trial team were excused from the court room to listen to tapes and examine documents contained in the two bankers' boxes. Following the close of evidence for the day, the government provided the court and Davis with a rough transcript of Det. Pace's grand jury testimony for review that evening.

The next morning, on October 30, 2019, the court heard argument from the government and Davis as to what should be done concerning Det. Pace's testimony and the other newly disclosed evidence contained in the bankers' boxes. Davis renewed by oral motion his motion to dismiss the First Superseding Indictment, arguing that this late disclosure was another violation of the court's discovery orders and that Davis has suffered prejudice. Upon review, the testimony of Det. Pace was directly related to the gang shootings at issue in this case, including the shootings on Berryman Avenue and Sunset Avenue, about which there was substantial trial testimony. In addition, this testimony articulated alternative reasons for the shootings other than the furtherance of the RICO conspiracy alleged by the government. Det. Pace testified:

> Umm...I can tell you this, a lot of the individuals involved in the investigation that we've uncovered are gang members um I don't know if this is gang activity. I don't know if it's actually one gang against another I just know a lot of individuals are involved in gangs. Truthfully what I've been told, this whole thing started over a breakup between a gentleman and a female and at the same time the female that broke up with the gentleman started dating a woman and her brother got robbed in a dice game by one of the...by the ex-boyfriend if that makes sense. So it could be a domestic or it could be a gambling debt gone wrong. I'm not sure

6

at this time. A robbery so to speak. That's what we think this whole thing started over and then it just retaliated one back and forth.[5]

Davis argues this newest discovery violation prejudiced him because: (1) he has had to continually change trial strategy based on new evidentiary disclosures; (2) he lost a member of his trial team for a day of trial; and (3) he is not confident that all relevant evidence or testimony has now been disclosed, or that the defense will not be surprised by belated disclosures in the midst of trial again.[6] The government argued that the disclosure, while a violation of the court's Scheduling Order, was not prejudicial to the defendant.

If that were not enough, questions again surfaced over the weekend of November 3–4 regarding the government's production. Defense counsel asserted that state court records suggested that a MJGJ was held on December 16, 2017, but no transcripts from that date had been produced. At the start of trial on November 5, 2019, the court again directed the government to contact Mr. Newman to address this discrepancy. After the evidence was concluded on November 5, the court heard testimony from Mr. Newman as to whether the MJGJ met on December 16, 2017. For various reasons, Mr. Newman concluded that the MJGJ did not meet on that date. Remarkably, however, during the course of Mr. Newman's November 5, 2019 testimony, the court was made aware that the MJGJ continued in 2018 and 2019, and that no one had not reviewed the testimony taken at those sessions to see whether any of it bore on the issues of this case. The next day, November 6, 2019, nearly a month since trial began, the government produced four additional transcripts to the court and defense

---

[5] This quotation is from an unverified transcript of Det. Pace's state grand jury transcript provided by the prosecution.

[6] As will be seen, this aspect of the defense argument was prescient.

7

based on the 2018–2019 MJGJ. While the content of the transcripts appears to relate to events post-indictment, the testimony of at least two witnesses during that session, one of whom testified in this case, references gang-related shootings and the subject of this case, the Rollin' 60s Crips.

It is distressing to the court that, after all of the wailing and gnashing of teeth that accompanied the government's myriad discovery failings, no one from the government's team had taken the steps necessary to assure the defense and the court that all relevant discovery had been produced. The sanction imposed by the court reflected in this opinion is required by the serial nature of the discovery failings in this case.

## II.

### a. Sanctions for prosecutorial misconduct.

The decision to impose sanctions pursuant to Rule 16(d)(2) lies within the sound discretion of the trial court. United States v. Young, 248 F.3d 260, 269 (4th Cir. 2001); see also United States v. Barile, 286 F.3d 749, 758 (4th Cir. 2002) ("Upon finding a violation of Rule 16, the district court has discretion under the Federal Rules of Criminal Procedure to determine the proper remedy.") In the exercise of its discretion relating to discovery violations, however, the court must consider "the reasons for the government's delay and whether it acted intentionally or in bad faith; the degree of prejudice, if any, suffered by the defendant; and whether any less severe sanction will remedy the prejudice and the wrongdoing of the government." United States v. Gonzales–Flores, 701 F.3d 112, 116 (4th Cir. 2012) (quoting United States v. Hastings, 126 F.3d 310, 317 (4th Cir. 1997)); see also United States

8

v. Muse, 83 F.3d 672, 675 (4th Cir. 1996) (finding that a trial court has discretion to fashion an appropriate remedy for a discovery violation).

Further, the Fourth Circuit has held that "[w]hen a court sanctions the government in a criminal case for its failure to obey court orders, it must use the least severe sanction which will adequately punish the government and secure future compliance." Hastings, 126 F.3d at 317. The Fourth Circuit has also found that "a continuance is the preferred [discovery] sanction." United States v. Sterling, 724 F.3d 482, 512 (4th Cir. 2013).

One potential, yet severe, sanction for prosecutorial misconduct is for the court to fully dismiss the indictment. In order to dismiss an indictment for prosecutorial misconduct, a court must find that the defendants were prejudiced by the misconduct. Bank of Nova Scotia v. United States, 487 U.S. 250, 263 (1988) (A district court has "no authority to dismiss the indictment on the basis of prosecutorial misconduct absent a finding that petitioners were prejudiced by such misconduct."); see also United States v. Derrick, 163 F.3d 799, 807 (4th Cir. 1998) ("[T]he Court's analysis and the text of its opinion confirm that Nova Scotia's holding applies equally to prosecutorial misconduct that occurs at the pretrial and trial stages of a prosecution.").

In Nova Scotia, the Supreme Court held that "a federal court may not invoke supervisory power to circumvent the harmless-error inquiry prescribed by Federal Rule of Criminal Procedure 52(a)." 487 U.S. at 254. In other words, a district court must ask if the error was harmless before imposing severe sanctions for prosecutorial misconduct. For example, in United States v. Hasting, 461 U.S. 499, 506 (1983), where the Supreme Court reversed and remanded the Seventh Circuit's reversal of a conviction based on prosecutorial

misconduct, the Supreme Court found the "[s]upervisory power to reverse a conviction is not needed as a remedy when the error to which it is addressed is harmless since, by definition, the conviction would have been obtained notwithstanding the asserted error."

Dismissal of an indictment may be warranted when egregious government conduct is "so outrageous as to shock the conscience of the court." United States v. Dyess, 478 F.3d 224, 234 (4th Cir. 2007) (internal citations omitted). A court may dismiss an indictment as a sanction for a prosecutor's failure to obey court orders or other violations of law pursuant to its supervisory power when the violation caused prejudice to the defendant or posed a substantial threat thereof. United States v. Goodson, 204 F.3d 508, 514 (4th Cir. 2000). However, dismissing the entire indictment is a drastic and severe sanction. United States v. Lee, 906 F.2d 117, 120 (4th Cir. 1990) (finding that "the district court erred in dismissing the indictment because, as the Supreme Court has explained, 'absent demonstrable prejudice, or substantial threat thereof, dismissal of the indictment is plainly inappropriate, even though the violation may have been deliberate.'") (quoting United States v. Morrison, 449 U.S. 361, 365 (1981)). In Lee, the Fourth Circuit reversed the district court's dismissal of the indictment as "plainly inappropriate" because the court did not find the defendant was prejudiced by the government's delay. 906 F.2d at 120.

### b. Discovery requirements.

Federal Rule of Criminal Procedure 16(a)(1)(B)(iii) provides, in pertinent part: "[u]pon the defendant's request, the government must disclose to the defendant . . . the defendant's recorded testimony before a grand jury relating to the charged offense." Fed. Rule Crim. Pro. 16(a)(1)(E) further provides "the government must permit the defendant to inspect and copy

10

or photograph books, papers, documents, data, photographs, tangible object, buildings, or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control and: (i) the item is material to preparing the defense; (ii) the government intends to use the item in its case-in-chief at trial; or (iii) the item was obtained from or belongs to the defendant." Additionally, the court has entered two orders relating to discovery. First, on March 5, 2019, the court entered its Third Amended Scheduling Order, ECF No. 364, requiring the government to substantially complete all pretrial discovery by April 1, 2019. Second, on October 25, 2019, the court entered an order ordering the government to produce all state special and MJGJ notes, transcripts, and other evidence relating to or pertaining in any way to the allegations brought in the First Superseding Indictment.

## III.

Following the first two claims of prosecutorial misconduct in this trial, the court found that the defendants were not prejudiced by the late evidentiary disclosure. When the court became aware of the MJGJ and Special Grand Juries impaneled to investigate gang-related crimes in the Danville area, the court imposed certain limited sanctions on the government in an attempt to mitigate prejudice and deter future misconduct. The court determined that while the disclosures at that time might not rise to the heightened level of prejudice to justify dismissal of the First Superseding Indictment, as requested by the defendants, something had to be done. But even those sanctions did not ensure that all of the state grand jury transcripts were produced to the defense in a timely fashion.

11

The court agrees that dismissal of an indictment is a severe sanction that can only be imposed following serious prejudice to the defendants. See Hastings, 126 F.3 at 317 (finding that "dismissal of the indictment against Hastings was an extreme and inappropriate sanction."); Derrick, 163 F.3d at 810 (listing alternative sanctions that were available to the court and were not employed prior to dismissal of the indictment). The court also acknowledges that any sanctions imposed must be "narrowly tailored." See Hasting, 461 U.S. at 506. At this point, the court does not find the actions of the prosecution to rise to the level of prejudice that requires a dismissal of the First Superseding Indictment. However, the court concludes that an intermediate sanction, something between the initial trial sanctions imposed on October 24, 2019 and the dismissal of the First Superseding Indictment, is required. Dismissing Count Ten alone is such an intermediate sanction. While Count Ten carries with it a mandatory life sentence, if convicted on the other counts in the First Superseding Indictment, Davis still faces the maximum penalty of a life sentence.

In assessing an appropriate sanction for prosecutorial misconduct, the court must consider the following factors: (1) the reasons for the government's delay and whether it acted intentionally or in bad faith; (2) the degree of prejudice, if any, suffered by the defendant; and (3) whether any less severe sanction will remedy the prejudice and the wrongdoing of the government. Gonzales-Flores, 701 F.3d at 116. Here, the court finds that the failure of the Commonwealth's Attorney's Office to provide the state grand jury testimony to the defense was, at best, gross negligence, that Davis has suffered some prejudice as a result of the

12

government's pattern of misconduct, and that a less severe sanction would not be a proper remedy or deter future misconduct.

### a. The government's actions constitute gross negligence.

The first factor the court must consider in sanctioning the government based on prosecutorial misconduct is the reason for the government's delay and whether it acted intentionally or in bad faith. There was a delay of over seven months from the close of discovery pursuant to the court's Scheduling Order and the government's disclosure of the existence of the state grand juries and the various relevant transcripts. It is worth noting that the undisclosed grand jury evidence did not come to light based on the government's exercise of diligence. Rather, this evidence only came to light because the defendants in this case and the related Bloods gang trial, United States v. Anthony, Case No. 4:18-cr-00012, noted a reference to state grand jury testimony in other discovery and sought its disclosure.

Once the existence of state grand jury testimony of two witnesses on the government's witness list came to light on October 16, 2019, the government's first response was to downplay this episode rather than conduct an exhaustive review of the Danville Commonwealth's Attorney's records relating to the state grand juries. For example, during the October 16, 2019 hearing, the court and Mr. Newman engaged in the following exchange:

> THE COURT: Okay. All right. I appreciate you're telling me [the Epperson and Washington] state grand jury transcripts are all there is. Mr. Newman, is that right?
>
> MR. NEWMAN: Yes, Your Honor, that's the only transcripts I'm aware of that touches specifically on the actions that are before Your Honor today. The August 20th, August 24th, the July -- I'm sorry, June 15th, or April 26 days.

13

Trial Tr. 9:3-11, Oct. 16, 2019. ECF No. 954. It took further questions to uncover the fact that while the Epperson and Washington transcripts were the only ones in existence, many other witnesses, including two defendants and other witnesses in the pending federal prosecution, testified before the MJGJ, but their testimony resided in tapes which had not been transcribed. At the end of the day, no good reason has been provided as to why the testimony before the MJGJ investigating violence in the Danville area was not reviewed and timely provided to the defense.

In short, over the course of the last several weeks, it has been like pulling teeth to determine whether the prosecution's discovery obligations, and the court's discovery orders, have been met as regards state grand jury investigations of gang violence in Danville. Given the fact that defendants and witnesses in this case appeared and testified before these state grand juries, at the very least the testimony should have been transcribed and reviewed for appropriate disclosure long ago. In this case, neither happened until after the jury was sworn.

Under the circumstances of this case, the failure to transcribe, review, and produce the state grand jury testimony before the trial began amounts to gross negligence. See Chapman v. City of Virginia Beach, 252 Va. 186, 190, 475 S.E. 2d 798, 800-01 (1996) ("Gross negligence has been described as the utter disregard of prudence .... It is a heedless and palpable violation of legal duty respecting the rights of others which amounts to the absence of slight diligence, or the want of even scant care.") (internal citations omitted); see also United States v. Shafer, 987 F.2d 1054, 1056 – 57 (4th Cir. 1993) (concluding that the government was grossly negligent when it failed to disclose Brady material until trial was underway because the evidence was in the possession of the local police).

14

When questioned by the court and Davis on October 29, 2019, Mr. Newman, to his credit, acknowledged that his record keeping was sloppy and inadequate. Instead of maintaining records of who appeared before the MJGJ and Special Grand Juries, Mr. Newman relied on the court reporters' written notes on the outside of a manila envelope to record and track witnesses that appeared before the grand juries. On at least one occasion identified by the defense, the names and numbers on the outside of the manila envelopes did not correspond with the number of tapes and names included within the envelope. The scant record keeping was compounded by the fact that, inconsistent with the requirements of a state statute, Mr. Newman failed to have the court reporter transcribe the testimony and properly maintain the records.

Under Virginia law, in order to impanel a MJGJ, two or more Commonwealth's Attorneys, with prior approval from the Attorney General of Virginia, must submit an application to the Supreme Court of Virginia. Va. Code §19.2-215.2. Mr. Newman followed this lengthy and detailed procedure to impanel the MJGJ.

One of the main differences between a regular state grand jury and a MJGJ or Special Grand Jury is the presence of a court reporter. Va. Code § 19.2-215.9 reads, in pertinent part:

> A court reporter shall be provided for a multi-jurisdiction grand jury to record, manually or electronically, and transcribe all oral testimony taken before a multi-jurisdiction grand jury . . . . Such transcription shall include the original or copies of all documents, reports, or other evidence presented to the multi-jurisdiction grand jury. The notes, tapes, and transcriptions of the reporter are for the use of the multi-jurisdiction grand jury . . . . After the multi-jurisdiction grand jury has completed its use of the notes, tapes, and transcriptions, the foreman shall cause them to be delivered to the clerk of the circuit court in

15

whose jurisdiction the multi-jurisdiction grand jury sits, with copies provided to special counsel.[7]

Mr. Newman was aware that Virginia law had different requirements for MJGJ and Special Grand Juries, as he had court reporters present during the MJGJ and Special Grand Juries to record the testimony. However, Mr. Newman failed to: (i) have the court reporters properly transcribe the testimony, as required by statute; and (ii) properly maintain the copies of the transcripts. Once the existence of the state grand jury testimony was uncovered, the failure to have them timely transcribed significantly slowed the discovery process as the tapes of the testimony had to be listened to and transcribed, often in rough form by a prosecution paralegal.

As a Commonwealth's Attorney and member of the prosecution team, Mr. Newman "is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win the case, but that justice shall be done." Berger v. United States, 295 U.S. 78, 88 (1935). While the court does not attribute bad faith to Mr. Newman or the prosecution team, the haphazard manner in which the testimony taken at these grand jury sessions was documented and maintained, and the serial delays in the production of these discovery materials once trial started, amounts to gross negligence.

---

[7] Virginia Code § 19.2-212 provides similar requirements for Special Grand Juries. While the failure to have transcripts prepared and filed with the clerk of the court is not, standing alone, sufficient to violate due process, Robinson v. Clarke, Case No. 16cv298, 2016 WL 4578331, at *4 (E.D. Va. Aug. 30, 2016), it is emblematic of the manner in which the records of these proceedings were handled by the Danville Commonwealth's Attorney.

### b. Davis has suffered prejudice.

Davis argues that he has suffered prejudice, and faces substantial risk of additional prejudice, because: (1) he has no confidence that there is not more relevant discovery from the various grand juries, and the materials that have been disclosed indicate that any additional grand jury discovery may prove to be exculpatory; (2) the defense team is forced to deal with the newly disclosed evidence during trial rather than prepare for trial; and (3) the pattern of discovery violations will undermine confidence in the outcome of the trial. ECF No. 1064.

The government argues that Davis has not suffered prejudice because any information provided in the late discovery is cumulative, speculative, or both. Furthermore, the government argues that the new evidence is not exculpatory, does not contain impeachment information, and does not implicate Brady. The government contends that Det. Pace's testimony was largely irrelevant to any issues related to this case and that the Det. Pace is not a government witness. ECF No. 1070.

The court concludes that Davis has suffered some prejudice from the late disclosure of the state grand jury testimony during trial. The court notes that the government's argument in its response to Davis' motion to dismiss is cabined solely to the most recent discovery violation. However, the court cannot examine prejudice from the discovery violations to Davis in isolation and must consider the cumulative nature of the serial discovery violations.

This is an unusual trial with respect to the amount of discovery provided by the government to the defense. Due to the number of defendants, length of the investigation, and seriousness of the crimes charged and possible sentences, the court took steps to streamline the government's disclosure of evidence to the defendants. First, on August 23, 2018, the

17

court entered an order appointing discovery counsel to oversee the discovery process. ECF No. 179. Second, on December 4, 2018, the court entered a scheduling order, directing the government to substantially complete all discovery by April 1, 2019. ECF No. 269 (as amended by ECF Nos. 297, 315, and 364). A Coordinating Discovery Attorney was retained and a special software program, Invendica, employed to manage the massive volume of discovery. The court took these steps, in part, to assure that the defendants would have ample time to review the voluminous discovery and incorporate it, as applicable, into their defense.

The court has presided over the trial of this case and has watched the defense scramble to absorb this late-breaking discovery while the trial has proceeded. Given the sheer volume of the discovery in this case, the court finds the distraction to Davis, in the midst of trial, with reviewing and analyzing this material in connection with all of the other discovery of this case, to be prejudicial. There are only so many hours in the day for the defense to actively listen to the government's witness testimony and prepare for effective cross-examination, not to mention review many pages of late disclosed testimony to ascertain potential relevance to this case. As noted, because of the enormous volume of discovery in this case, the court ordered that all discovery be provided over seven months ago. And yet, in this complicated RICO conspiracy case, discovery has continued to stream in after trial started, to the prejudice of defendant Marcus Davis.

In addition to having to incorporate this late-breaking evidence into their trial strategy, a member of Davis' trial team was forced to miss an entire day of trial while the parties listened to the grand jury tapes found in the bankers' boxes provided by Mr. Newman on October 29, 2019. At that point, while the government had not finished its case-in-chief, counsel for Davis

18

was forced to both prepare for the cross-examination of the government's witnesses and review the late disclosed grand jury testimony. While counsel in this case are effective advocates, the time crunch on all was palpable. Given the enormous amount of discovery produced in this case and the time and effort necessary to marshal it for effective trial cross-examination, the continued discovery violations and disclosure of new evidence represent some prejudice to Davis.

Further, in his most recent motion to dismiss filed on November 3, Davis identified two discrepancies regarding the grand jury information provided by Mr. Newman, including a scheduled MJGJ on December 16, 2017, for which there are no documents or tapes, and an April 26, 2016 meeting of the Special Grand Jury, for which there are no records of subpoenas. To try to put a lid on this Pandora's Box, after the close of evidence on November 5, 2019, the court held a hearing in response to Davis' assertions relating to the grand jury records at which the government called Mr. Newman to testify. Mr. Newman testified that at the court's direction, Mr. Newman, along with another member of the prosecution team, reviewed the grand jury documents at the Danville Circuit Court and determined that there was not a scheduled MJGJ meeting on December 16, 2017. The government relied on attendance records kept by the court reporter, payment records to the grand jury kept by the clerk of the court, and that December 16, 2017 was a Saturday, and the MJGJ did not meet on weekends. With respect to the April 26, 2016 meeting of the Special Grand Jury, Mr. Newman testified that he produced all subpoena records relating to the MJGJ and Special Grand Juries between 2015 and 2018 in his possession to the prosecution team. The fact that his disclosure did not

19

contain subpoena records for April 26, 2016, only meant that he no longer had copies of such subpoenas.

During his testimony on November 5, 2019, Mr. Newman revealed that although the MJGJ continued in 2018 and 2019, he had not looked to see whether the testimony taken there bore on the issues of this case. To some extent, the failure to examine the testimony taken during these grand jury sessions might be excused by their subsequent dates, as the initial federal Indictment in this case was filed in June 2018. But these dates provide the prosecution no refuge from their discovery obligations as the Indictment was superseded on November 6, 2018, alleging that the RICO conspiracy continued through that date.

Moreover, the transcripts produced by the government at the end of the day on November 6, 2019 bear some relation to the cast of characters involved in this case. For example, one of the transcripts includes testimony from Detective Newcomb, a government trial witness, and Antonio Burton, a self-identified former Rollin' 60s Crips member. Burton's testimony describes gang-related conflict in Danville and mentions Tony "Pulla" King, a person named multiple times during this trial. In fact, the very next day, on November 7, 2019, the government called Det. Newcomb and Tyson Bowens as witnesses. The government questioned Bowens about his association with both King and Burton and growing up with Burton in the 800s neighborhood. When trial started on November 7, 2019, counsel for Davis conceded that they had not yet had a chance to review the four new transcripts as they were preparing for the next day's testimony until the early hours of the morning. Plainly, the timing of the production of this state grand jury testimony referencing witnesses and persons involved in this case has prejudiced Davis to some extent.

20

In the end, the court finds that the distraction of this late-breaking discovery has caused some prejudice to Davis. Unlike the earlier disclosures, the most recent revelations have come during trial while evidence was being taken. Moreover, Det. Pace's testimony produced on October 29, 2019 is to some extent exculpatory as it suggests that certain of the violence in this case was not done to further one's standing in a RICO enterprise but resulted from a personal domestic dispute or a dice game.

### c. Dismissal of Count Ten is the appropriate intermediate sanction.

Because the court has determined that Davis has suffered some prejudice as a result of the late disclosed evidence and that the prosecution was grossly negligent in complying with their discovery obligations, the only remaining question is whether the court will impose sanctions and, if so, what is the proper sanction. While the Fourth Circuit has stated that "a continuance is the preferred [discovery] sanction," Sterling, 724 F.3d at 512, the decision to impose a sanction lies within the sound discretion of the court. Young, 248 F.3d at 269. The court concludes that the intermediate sanction between a continuance and full dismissal of the indictment is a dismissal of Count Ten of the First Superseding Indictment. This dismissal remedies the discovery violation as to the prejudice caused to Davis, adequately sanctions the government for its pattern of discovery violations, and helps deter future violations.

The government argues that dismissal of Count Ten is too severe a penalty for violating the court's Scheduling Order. The government relies on a number of cases to make this argument, all of which are distinguishable from the case at hand. First, the government identifies United Sates v. Lowery, 284 F. App'x 64, 70 (4th Cir. 2008), where the prosecution produced to the defendant a memorandum before trial, but after the date in the scheduling

21

order. In Lowery, the court found that the government produced the one-page document before trial, giving the defendant sufficient time to fully analyze the statement before trial began. In Unites States v. Soberon, 929 F.2d 935 (3d Cir. 1991), the Third Circuit found that the district court abused its discretion by dismissing a count of an indictment based on prosecutorial misconduct before a grand jury. Similarly, in United States v. Accetturo, 858 F.2d 679 (11th Cir. 1988), the Eleventh Circuit found no prejudice to defendant where the government delayed telling the defendant's attorney that he was also a target of the grand jury investigation. As with Lowery, the issues in Soberon and Accetturo occurred before trial and were limited to issues in front of a grand jury. Moreover, each of these cases involved single, specific instances of misconduct as opposed to the ongoing serial nature of discovery violations that have plagued the trial of this case.

The only case with facts relevant to the case at hand that the government identifies is United States v. Parris, 16 F. App'x 700 (9th Cir. 2001). In Parris, the Ninth Circuit found that the government's disclosure of two exhibits after five days of trial, when paired with two other incidents of prosecutorial misconduct, did not qualify as the type of "flagrant misbehavior" required to warrant dismissal under the court's supervisory powers. Id. at 701. Parris is distinguishable because in that case the court found the government's conduct was due to incompetence and other non-invidious factors, id., while here the prosecution, acting through the Danville Commonwealth's Attorney, serially violated the court's orders. The court finds that these repeated violations require the intermediate sanction of the dismissal of Count Ten.

Additionally, the court has twice adhered to the path prescribed in Sterling. First, responding to the government's late disclosure of the Anthony tape, the court determined that

22

no sanctions were required, and a continuance was not necessary because the defendants had sufficient time to incorporate the tape into their defense. Second, in response to the second discovery violation regarding the first disclosure of the grand jury transcripts, the court imposed certain sanctions, including a lengthy continuance to allow the defendants enough time to weave the new testimony into their cases. At that point no testimony had been given and no evidence had been received, and the court attempted to remedy any prejudice by restricting the government from introducing certain evidence and permitting Davis to give another opening statement.

Now we are at strike three, and the government has again violated the court's orders and Fed. Rule Crim. Pro. 16(a). Because violating two court orders concerning discovery is a serious concern and the previous continuance was ineffective at deterring additional discovery failings by the Danville Commonwealth's Attorney, the court finds that a more serious sanction is necessary and appropriate. Indeed, at this late date a continuance is hardly feasible as the evidence was concluded on November 8, 2019, just two days after the last transcripts were delivered. However, the court recognizes that the level of prejudice sustained does not rise to such a level as to justify dismissing the entire First Superseding Indictment. At this point in the case, having first hand experienced the practical problems associated with the trial of this case amidst a cascade of late produced state grand jury testimony, the court sees little option but to impose an intermediate sanction and dismiss Count Ten of the First Superseding Indictment. Davis remains subject to the jury's decision on the remaining counts. If convicted on those counts, Davis continues to face a maximum penalty of life imprisonment.

23

As an additional sanction, Mr. Newman is dismissed as counsel of record for the United States in this case.

## IV.

For the reasons stated above, Davis' motion to dismiss is **GRANTED** in part as it pertains to dismissing Count Ten of the First Superseding Indictment and **DENIED** in part as it pertains to dismissing Counts One, Eleven, Twelve, and Thirteen of the First Superseding Indictment. Further, Michael Newman is **DISMISSED** as counsel of record for the United States in this case.

It is **so ORDERED**.

Entered: 11-08-2019

/s/ Michael F. Urbanski

Michael F. Urbanski
Chief United States District Judge

Case 4:18-cr-00011-MFU-RSB   Document 1102   Filed 11/08/19   Page 24 of 24   Pageid#: 9399